OPINION OF THE COURT
Acosta, J.
This appeal requires us to consider whether a real estate agreement, with an underlying consent requirement, negotiated at arm’s length by sophisticated, counseled business people with full knowledge of the consent requirement and its potential risks, must be vacated. On the facts of this case, where plaintiff is using the consent requirement to avoid its obligations under *3 the agreement, we hold that the parties are bound by the terms of the agreement.
The New York City Department of Housing Preservation and Development (HPD) sold two parcels of land on Cherry Street in lower Manhattan, which were part of an urban renewal plan for neighborhood revitalization. The purchasers agreed to develop the properties, subject to the terms and conditions in so-called land disposition agreements restricting use and development, breach of which would enable the City to reclaim the properties. The June 3, 1981 disposition agreement between the City and purchaser Cherry-Pike Corporation provided for a Pathmark supermarket to be constructed and operated for 25 years. The purchaser could lease or sublease to a tenant other than Pathmark upon obtaining the prior written approval of HPD, “which shall not be unreasonably withheld or delayed.” The purchasers of the parcels subsequently entered into lease agreements with defendant Pathmark. Pursuant to one of the leases, Pathmark was to use the land as a supermarket for 25 years. Article 22 of the lease permitted Pathmark to sublet or assign the lease, and did not specifically make reference to the disposition agreement or the HPD consent requirement for assignment of the lease. The second lease permitted non-food retail operations. Thereafter, intervenor Cherry Street LLC acquired the interests of the original purchasers of the properties and became Pathmark’s landlord.*
As a result of the steep rise in the value of Manhattan real estate between 1981 and 2007, it became evident that operating a supermarket was not the most profitable use of the premises, and Cherry Street began to explore potential redevelopment schemes. Indeed, Cherry Street’s principal testified that Cherry Street expected to receive HPD approval to use the land for some other purpose because HPD “would want more housing.” Meanwhile, Extell Development, Inc., a sophisticated real estate developer, formed plaintiff CPS Operating Company LLC for the purpose of acquiring Pathmark’s rights under its two leases with Cherry Street. Consequently, both Cherry Street and Ex-tell had embarked upon competing attempts to develop the property by, in part, assuming Pathmark’s leasehold interest therein. *4 Indeed, Extell endeavored, unsuccessfully, to purchase Cherry Street’s interest in the parcels before commencing negotiations with Pathmark, albeit it continued to negotiate with Cherry Street LLC thereafter.
Eventually, on August 14, 2007, Extell, through CPS, entered into an assignment contract with Pathmark under which CPS would purchase Pathmark’s leasehold interest in the two parcels for the total price of $87 million. A deposit of $5 million was placed in an interest-bearing escrow account. Section 16 of the assignment contract provided, “Seller or Buyer shall be in default under this Contract if either fails to comply with any material covenant, agreement or obligation within any time limits required by this Contract.”
Significantly, and dispositive of this appeal, the leasehold assignment contract provided that Pathmark’s leasehold interests were to be transferred “subject ... to the Permitted Exceptions . . . , the leases, zoning ordinances and laws” (leasehold assignment contract schedule C-l § 3), and the “permitted exceptions” included both the “Terms, Covenants, Conditions, Provisions and Reverter set forth in the Land Disposition Agreement dated as of 6/3/1981 between The City of New York and Cherry Pike Corp.” (leasehold assignment contract schedule C-l § 1 [a]) and the “Terms, Covenants, Conditions, Provisions of the Lease, dated as of 8/6/1981 between Cherry-Pike Corp., landlord, and [Pathmark], tenant” (id., schedule C-l § 2). Path-mark also represented and warranted to CPS that it was “not prohibited from consummating the transactions contemplated in this Contract, by any (i) law or regulation, (ii) agreement, instrument or restriction to which [Pathmark] is a party or is bound (other than the . . . Permitted Exceptions) or (iii) order or judgment against [Pathmark]” (leasehold assignment contract § 8 [a] [emphasis added]), and that “as of the Closing, there will exist no material default by the tenant [Pathmark] under any Leases which would entitle the landlord thereunder to terminate such Lease” (id. § 8 [f|). Pathmark was “selling the Property ‘as-is, where is’ with all faults and without representation, warranty or condition with respect to physical condition, building operations, merchantability or fitness for a particular purpose and without any other warranty or representation whatsoever by [Pathmark]” (id. § 9).
Before the adjourned closing date, Cherry Street delivered a notice to Pathmark that consummation of the assignment contract would constitute a default of the supermarket lease *5 and the underlying disposition agreement with HPD. Pathmark took no action to cure the alleged default, contending that it did not seek HPD’s approval of the assignment of the supermarket lease to CPS because CPS had waived this requirement.
In any event, after receiving notice of Cherry Street’s position regarding the HPD consent provision, CPS nonetheless placed an additional $1 million in escrow to extend the closing by one month. When market forces changed, however, CPS relied on the HPD consent requirement to terminate the contract and demand the return of its deposit. CPS commenced this declaratory judgment action, and both parties moved unsuccessfully for summary judgment. On appeal, Pathmark argues in part that it was not mandated to procure HPD’s consent to the assignment because CPS waived the consent requirement by listing the underlying disposition agreement as a “Permitted Exception” in the assignment contract. Pathmark is correct.
The record is very clear that CPS, a sophisticated real estate development firm, was aware of the consent requirement but was willing to go forward nonetheless. In fact, even after receiving a copy of Cherry Street’s October 31, 2007 letter to Path-mark directing Pathmark’s attention to section 401 (B) of the land disposition agreement that contained the HPD consent requirement, CPS put down an additional $1 million to adjourn the closing by one month. This makes perfect sense since Cherry Street expected to receive HPD approval to use the land for some other purpose. It was only when market forces changed that CPS sought to get out of the deal. CPS is now using the consent requirement as a pretext to avoid its obligations under the agreement. Indeed, if CPS were truly concerned about HPD’s interest, it could have brought HPD in as a party. Under these circumstances, CPS should be held to its end of the bargain (Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004] [“(W)hen parties set down their agreement in a clear, complete document, their writing should ... be enforced according to its terms,” particularly in “the context of real property transactions, where commercial certainty is a paramount concern, and where . . . the instrument was negotiated between sophisticated, counseled, business people negotiating at arm’s length” (internal quotation marks and citations omitted)]).
Moreover, here, where two sophisticated real estate business entities were willing to take the risk involved in negotiating the assignment of a lease with an underlying consent requirement, *6 the requirement can be treated as a “permitted exception.” Where a real estate contract identifies an exception as a “permitted exception,” the transaction is to proceed despite that exception (see Rozen v 7 Calf Cr., LLC, 52 AD3d 590, 591-592 [2008] [where contract for sale of real property was “subject to” list of “Permitted Exceptions,” defendants could not deliver title as required because “there was a recorded exception which was not included as a permitted exception in the contract” (emphasis added)]; 681 Chestnut Ridge Rd. LLC v Edwin Gould Found, for Children, 23 Misc 3d 1110[A], 2009 NY Slip Op 50694[U], *5 [2009] [dismissing claim of breach of easement on title being transferred, because easement was “permitted exception” in contract]; Dunn v Arniotes, 15 Misc 3d 1144[A], 2007 NY Slip Op 51141[U], *4 [2007] [where real estate contract identified zoning as “permitted exception,” party could not purport to rescind contract based on zoning changes]).
Here, in light of this settled principle and the parties’ clear, unambiguous contract listing both the 1981 disposition agreement between the City and Cherry-Pike and the lease between Cherry-Pike and Pathmark as “Permitted Exceptions” there is no triable issue of fact whether Pathmark was required to obtain HPD’s approval prior to assigning its lease to CPS.
Moreover, the “permitted exceptions” were recognized by the parties in the “Representations” section of the assignment contract, and the assignment contract provided that Pathmark would convey insurable leasehold interest “free and clear of all liens and encumbrances, other than the ‘Permitted Exceptions’ ” (emphasis added). CPS knew very well what it was getting itself into. In fact, it initially attempted to negotiate directly with Cherry Street LLC in an unsuccessful bid to obtain an interest in the parcels before commencing negotiations with Pathmark. CPS simply took a calculated risk that did not pay off.
In a well-reasoned dissent, our learned colleague maintains that Pathmark cannot rely on the permitted exceptions provisions of the assignment contract because the HPD-approval provision qualifies as a covenant running with the land that is binding on Pathmark. The purpose of the provision in the land disposition agreement requiring the operation of a supermarket for 25 years, he points out, was to enable the City to effectuate important public policies, specifically to remediate urban blight and create a viable residential neighborhood. To allow Path-mark to avoid the HPD-approval provision would contravene *7 the very purpose of the approval requirement. Although these are valid concerns, we do not find them dispositive of this appeal.
Initially, it should be noted that the City, which imposed the HPD-consent provision 25 years earlier, is not seeking to intervene in the proceedings. This comes as no surprise since only 17 months remained on the 25-year period contemplated by the original agreement, and the assignment agreement between CPS and Pathmark provided for the continued operation of the supermarket by Pathmark for the immediate future. But, even if the City intervened and sought to enforce the covenant, that is the risk that Pathmark was willing to take. The provision, after all, provided that the property could be leased or subleased to some other tenant upon obtaining HPD’s written approval, “which shall not be reasonably withheld or delayed,” and CPS’s principals assumed that they could get the necessary approval from HPD to use the land for some other purpose and were willing to take the risk of HPD’s refusal to approve. It should also be noted that this was not a very big risk. Indeed, as noted above, Cherry Street expected to receive HPD approval to use the land for some other purpose.
In this respect, 328 Owners Corp. v 330 W. 86 Oaks Corp. (8 NY3d 372 [2007]), relied upon by our dissenting colleague, is distinguishable because there the City sought to enforce the covenant running with the land. Here, on the other hand, the City never sought to intervene, and CPS, which is now attempting to enforce the covenant, was willing to work around it, as evidenced by its listing the requirement as a “permitted exception” and putting down an additional $1 million deposit even after Cherry Street broached the subject.
Nor does the result we reach constitute a subversion of the land disposition agreement, because the result here does not preclude its ultimate enforcement. The issue here is who will bear the loss from CPS’s withdrawal from the contract. Given the circumstances of this case, CPS should bear the loss.
Last, Cherry Street’s carefully worded letter was not a “default notice” constituting an automatic breach of the assignment contract. In fact, it never stated that Pathmark was in default. Rather, the letter stated Cherry Street’s disapproval of the false assumption that Extell would demolish the building immediately, even though the assignment contract contemplated that Pathmark would continue to operate its supermarket for the time being. In any event, the lease expressly provided that *8 Pathmark could assign the lease, and the disposition agreement between Cherry-Pike and the City did not place any obligations oh Pathmark. Given Extell’s negotiations with Cherry Street, it clearly was attempting to obtain both Pathmark’s and Cherry Street’s interest in the property, and the letter may well have been intended to give Cherry Street an advantage in the bargaining process. Regardless of the intent of the letter, it was not a default letter entitling CPS to back away from the agreement.
Accordingly, the order of the Supreme Court, New York County (Herman Cahn, J.H.O.), entered February 27, 2009, which, to the extent appealed from, denied defendant’s motion for summary judgment dismissing the complaint, should be reversed, on the law, without costs, the motion granted, and the complaint dismissed.

 Cherry Street’s motion to intervene was granted to the extent of permitting Cherry Street to serve and file a notice of appearance, and requiring the parties to serve any and all papers served in the action upon counsel for Cherry Street and to notify counsel for Cherry Street of anything that took place in the action.